| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00103-JAW |
| | ) | |
| DONALD CAIN | ) | |

## ORDER ON DEFENDANT'S MOTIONS TO RECUSE

I reject a defendant's motion to recuse because, having reviewed the defendant's reasons for my recusal, I find that they neither have record support nor present a sufficient basis to conclude that an objective, reasonable member of the public, fully informed of all the relevant facts, would fairly question my impartiality.

## I.    BACKGROUND

On August 9, 2016, a federal grand jury indicted Donald Cain on one count of stalking, an alleged violation of 18 U.S.C. § 2261A(2)(B), and two counts of transmitting threatening communications in interstate commerce, alleged violations of 18 U.S.C. § 875(c). *Indictment* (ECF No. 56). On January 9, 2018, Mr. Cain pleaded guilty to the stalking count, *Min. Entry* (ECF No. 153), and on July 20, 2018, the Court sentenced him to sixty months of incarceration, three years of supervised release, no fine, and a $100 special assessment. *J.* (ECF No. 197). On July 27, 2018, Mr. Cain appealed his sentence to the Court of Appeals for the First Circuit, and on July 1, 2019, the First Circuit affirmed the Court's sentence. *Notice of Appeal* (ECF No. 199); *United States v. Cain*, 779 F. App'x 6, 11 (1st Cir. 2019).

On September 30, 2019, Mr. Cain filed a motion to disqualify me as a judge from continuing to preside over his criminal case and specifically from ruling on a

federal habeas corpus petition that he had filed in the United States District Court in Texas and that was being transferred to the District of Maine.[1] *Mot. Pursuant to 28 USC § 455 to Disqualify USDJ John A. Woodcock and USMJ John Nivison in Above Case and Pending § USC 2255 Transferred from USDC Fort Worth, Texas* (ECF No. 216) (*Def.'s Sept. Mot.*). On October 15, 2019, Mr. Cain filed a second motion, asking to remove me from the case and asking that "no strike" be applied against his § 2255 petition. *Mot. to Remove Judge Woodcock from Case and Mot. that No Strike Be Applied re 2255* (ECF No. 223) (*Def.'s Oct. Mot.*). On November 22, 2019, the Government responded to both motions. *Gov't's Resp. in Opp'n to Def.'s Mot. to Disqualify Judge Woodcock and Magistrate Judge Nivison* (ECF No. 232) (*Gov't's Opp'n Sept. Mot.*); *Gov't's Resp. in Opp'n to Def.'s Mot. to Remove Judge Woodcock from Case and Mot. that No Strike Be Applied re: § 2255* (ECF No. 233) (*Gov't's Opp'n Oct. Mot.*). On December 16, 2019, Mr. Cain filed a sixteen-page reply regarding his September motion. *Resp. to Mot. to Disqualify Judge John A. Woodcock and Magistrate Judge John Nivison* (ECF No. 234) (*Def.'s Reply Sept. Mot.*).

On December 20, 2019, Mr. Cain filed an affidavit of Steven M. Blanchette of Oakland, Kennebec County, state of Maine. *Aff.* (ECF No. 235). In his affidavit, Mr. Blanchette states that "before the trial Mr. Cain[']s lawyer Hunter asked Judge Woodcock to court-appoint him at which the judge said 'he was not going to waste tax payer dollars because Mr. Cain makes good money and he should have gotten more, take it as a lesson learned and suck it up.'" *Id.* at 1. Mr. Blanchette states that he

---

[1]    Mr. Cain also moved for Magistrate Judge Nivison to recuse himself, but I am dealing here only with his recusal motion against me.

believes that "Mr. Cain was coerced by his lawyer to take a plea being Mr. Cain wasn't paying him anymore money and Mr. Cain wanted to go to trial." *Id.* He avers that Mr. Cain's lawyer "also stated that if he didn't take a plea the courts would hold Mr. Cain in lockup until the trial was finished." *Id.* Finally, Mr. Blanchette adds that during the sentencing hearing, I "called Mr. Cain a terrorist and ignored the recommendation of the prosecutor and sentenced Mr. Cain to the full extent." *Id.* at 1-2.

## II.   THE PARTIES' POSITIONS

### A.   Donald Cain's Motions

#### 1.   Donald Cain's September 2019 Motion

Mr. Cain's September motion briefly alleges that I violated Canons 2 and 3 of the Code of Conduct for United States Judges by failing to act in a manner that promoted public confidence in the integrity and impartiality of the judiciary and failing to perform the duties of my office fairly, impartially, and diligently. *Def.'s Sept. Mot.* at 1. To this motion, Mr. Cain attached a two-and-a-half-page letter dated September 26, 2019. *Id.*, Attach. 1, *To Steve Blanchette, Amber Cain, Kris Cain, and April Kumer* (*Def.'s Sept. Letter*). In the letter, Mr. Cain states that he filed a judicial complaint against me with the First Circuit Court of Appeals. *Def.'s Sept. Letter* at 1. Next, he states that "[h]ad they not used my Counsel Hunter Tzovarras, to coerce me into a plea, I would not be here in prison." *Id.* He claims that I should have "dismissed Hunter from case" when I chose not to court-appoint him. *Id.* Mr. Cain points out that I allowed Attorneys Weyrens and Silverstein to resign as counsel for

non-payment.  *Id.*  Mr. Cain then relates his side of his relationship with the victim that led to the stalking indictment.  *Id.* at 1-3.  In this motion and attachment, his major complaint against me is that I should have dismissed Attorney Tzovarras as his defense counsel and failed to do so.

### 2.    Donald Cain's October 2019 Motion

Mr. Cain slightly expands his allegations against me in his October motion. *Def.'s Oct. Mot.*  The October motion itself asserts that the federal indictment must be dismissed because there was an accord and satisfaction filed by the alleged victim in this case in state court.  *Id.* at 1.  Mr. Cain writes:  "This Court deemed Me, Donald Cain 'delusional' when I informed the Court, Judge John A. Woodcock there was an Accord and Satisfaction, that mysteriously disappeared, but has resurfaced after the Void Judgment issued in this case."  *Id.*

To this motion, Mr. Cain attached a copy of an order from United States District Judge John McBryde dated September 6, 2019, concluding that Mr. Cain's motion was in fact a motion under 28 U.S.C. § 2255, not a motion under 28 U.S.C. § 2241, and that, in light of *Castro v. United States*, 540 U.S. 375, 377 (2003), Judge McBryde intended to construe the motion as one under § 2255, that as a result the motion would be transferred to the United States District Court for the District of Maine, and that "so construing the document will cause it to be subject to § 2255's 'second or successive' restrictions."  *Id.*, Attach. 1, *Order* (*Donald Cain v. United States*, No. 4:19-cv-660-A (N.D. Tx. Sept. 6, 2019)).  Judge McBryde gave Mr. Cain

until September 24, 2019, to withdraw his filing. *Id.* at 2. Mr. Cain also attached copies of two docket entries in this case. *Id.*, Attachs. 2-3.

## B. The Government's Responses

### 1. The Government's Response to Donald Cain's September Motion

In its response to Mr. Cain's September motion, the Government reviewed both the underlying facts and the applicable law of 28 U.S.C. § 455(a) and argued that neither the facts nor the law require recusal. *Gov't's Opp'n Sept. Mot.* at 1-13. The Government assessed the underlying facts and contended that the record did not support Mr. Cain's allegations. *Id.* at 1-6. The Government reviewed the applicable legal standards for recusal. *Id.* at 7-9. The Government questioned whether Mr. Cain's motion is timely. *Id.* at 9-10. Finally, applying the record facts to the proper legal standard, the Government maintained that I should deny the motion to recuse. *Id.* at 10-13.

### 2. The Government's Response to Donald Cain's October Motion

In its response to Mr. Cain's October motion, the Government did not address the recusal issue and dealt only with the question of whether his August 22, 2019, § 2255 motion should be considered a first § 2255 motion. *Gov't's Opp'n Oct. Mot.* at 1-7.

## C. Donald Cain's Reply

In his December 16, 2019, sixteen-page reply, Mr. Cain became much more specific in terms of his allegations against me. He claimed the following:

(1)     that I "never let [Mr. Cain's] counsel speak always yelling at him and telling him to sit down and shut up, stating that he could have been enjoying his family and evening instead of reading his meaning my attorney, Hunter Tzovarras's friv[o]lous motion[s];"

(2)     that I made "racist[] comments either direct towards [Mr. Cain], or [his] family or [his] current girlfriend at the time;"

(3)     that I made "threats that [Mr. Cain] was going to pay for hurting that 'young lady', meaning [his ex-wife];"

(4)     that I "denied to court appoint Hunter Tzovarras" and instead stated in court: "I am not going to use tax payer money to fund Mr. Cain's defense, you should have got more money up front and let this be a lesson learned, and suck it up;"

(5)     that I "held ex parte meetings with [the victim] available to attend but not [Mr. Cain]" and although his lawyer was present on the telephone, the Assistant United States Attorney (AUSA), the victim, and I were together with each other in person;

(6)     that I made up my mind on his sentence when I stated at the end of the revocation hearing that "it's just a matter of time when Mr. Cain starts serving his time May 25, 2018 or June 28, 2018;"

(7)     that I imposed a sentence that violated the Eighth Amendment ban on cruel and unusual punishment;

(8)     that I showed favoritism to the AUSA by complimenting her;

(9)     that I was aware of plea negotiations between the AUSA and Attorney Tzovarras;

(10)    that I violated the terms of the plea agreement;

(11)    that I should recuse myself because he filed a judicial misconduct complaint against me with the First Circuit Court of Appeals; and

(12)    that at the sentencing hearing, he "made it clear that [he] was in no condition to be sentenced that day, [he] was having tremendous chest pains, [he] was on medication that caused dizziness and lightheadedness" and that he "could not compose [him]self to even read [his] statement, to the court."

*See Def.'s Reply Sept. Mot.* at 1-3, 9.

## III.   LEGAL STANDARDS

A United States judge is required to recuse "in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a); *United States v. Reynolds*, 646 F.3d 63, 74 (1st Cir. 2011).  The First Circuit has held that the standard for recusal under § 455(a) is "whether an objective, reasonable member of the public, fully informed of all the relevant facts, would fairly question the trial judge's impartiality."  *In re United States*, 441 F.3d 44, 56-57 (1st Cir. 2006) (internal quotation marks omitted).

Recusal under 28 U.S.C. § 455(a)[2] is generally warranted only when the judge's alleged bias or prejudice can be traced to "a source outside the judicial proceeding at

---

[2]    There is a separate statutory provision on recusal, 28 U.S.C. § 144, that involves the filing of an affidavit by a party.

hand . . .." *Liteky v. United States*, 510 U.S. 540, 545, 554-56 (1994); *see also In re United States*, 441 F.3d at 66-68. The *Liteky* Court noted that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion . . . . and can only in the rarest circumstances evidence the degree of favoritism or antagonism required [for recusal] . . . when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Though it is possible that a judge might develop and display such "deep-seated and unequivocal antagonism" toward a party that fair judgment would become "impossible" and recusal necessary, *Liteky*, 510 U.S. at 556, "a judge's rulings and statements in the course of proceedings before him or her rarely provide a basis for recusal under § 455(a)." *In re United States*, 441 F.3d at 67.

Although the rule about judicial rulings not forming the basis for a recusal is strong, it is not absolute. The First Circuit adopted the view that, even if a judge's alleged bias comes from events at trial, "judicially acquired information can form the basis of a judge's disqualification . . .." *United States v. Chantal*, 902 F.2d 1018, 1022 (1st Cir. 1990) (quoting *Panzardi-Alvarez v. United States*, 879 F.2d 975, 983-84 (1st Cir. 1989)). In the First Circuit, the standard for recusal is "whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable [person]." *Id.* at 1022 (quoting *Panzardi-Alvarez*, 879 F.2d at 983).

At the same time, the First Circuit has observed that "the defendant's claim and its implications cannot themselves alone suffice to require the judge's recusal, lest the law confer a veto power on the assignment of his trial judge to any heckling defendant who merely levels a charge that implicates a judge's defensive or vicariously defensive reaction." *In re Bulger*, 710 F.3d 42, 46-47 (1st Cir. 2013) (Souter, J.). Justice Souter went on to write for the First Circuit that "[t]he recusal standard must be more demanding because 'the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* at 47 (quoting *In re Allied-Signal, Inc.*, 891 F.2d 967, 970 (1st Cir. 1989)). Indeed, "[t]he trial judge has a duty not to recuse himself or herself if there is no objective basis for recusal." *In re United States*, 441 F.3d at 67.

## IV. DISCUSSION

### A. Factual Inaccuracies

Mr. Cain's motion is replete with factual inaccuracies. First, Mr. Cain places quotation marks around statements I supposedly made in court. Although the transcripts of all the proceedings are available on the docket, Mr. Cain fails to cite the transcripts. Instead, he fabricates quotations.[3] As a review of the actual

---

[3]     This conduct by a lawyer—fabricating quotations—would be sanctionable. *See* Me. R. Prof. Conduct 3.3(a)(1) ("A lawyer shall not knowingly . . . make a false statement of fact . . . to a tribunal . . . ."). Even though he is representing himself, Mr. Cain should be more careful in the future to be accurate in his quotations.

transcripts reveals, I said almost none of the things that Mr. Cain quotes me as saying. *See Tr. of Proceedings, Sentencing Proceedings* (ECF No. 210) (*Sentencing Tr.*); *see also Tr. of Proceedings, Hearing on Mot. to Revoke Bail and Detention Hearing* (ECF No. 208) (*Bail and Detention Hearing Tr.*); *Tr. of Proceedings, Rule 11 Proceedings* (ECF No. 209) (*Rule 11 Tr.*). Furthermore, I have no memory of telling Attorney Tzovarras to "shut up" or to "suck it up." I try not to use that kind of language in the courtroom.

Mr. Cain's second allegation is that I made racist remarks to him and his family. Again, he makes no citation in the record to any such remark and I found none. To accuse anyone, including a judge, of racial bias cuts to the quick, especially as more recently courts and the academy have developed the concept of implicit bias, where a person may "unconsciously act on such biases even though we may consciously abhor them." *State v. Williams*, 929 N.W.2d 621, 639 (Iowa 2019) (Wiggins, J., dissenting in part); *see* Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 CALIF. L. REV. 945, 946 (2006) ("[T]he science of implicit cognition suggests that actors do not always have conscious, intentional control over the processes of social perception, impression formation, and judgment that motivate their actions").

With this understanding, I reviewed this case to determine whether I made any remarks that could have reasonably been interpreted as racist and found none. I also reviewed the case to assess whether there was anything that could have led someone, including Mr. Cain, to conclude that I was explicitly or implicitly racist

against him, his family, and his current girlfriend.  Again, I recalled nothing that could have led to the charge of either explicit or implicit racism.

Nor is this surprising in Mr. Cain's case.  When I read his motion, the allegation of racial bias came as a surprise, because—other than recalling that Mr. Cain appeared white as opposed to another ethnic group—I had no memory of Mr. Cain's race or nationality.  In reviewing the Presentence Investigation Report (PSR), I discovered that the PSR describes Mr. Cain's race as white and his heritage as Hispanic.  *PSR* at 2.  There is nothing else in the PSR, including his parentage and his childhood, that mentions his race or Hispanic heritage.  *See PSR* at 1-29.  I never referred to his race or ethnicity, nor would I have done so.  Mr. Cain's race and ethnicity were and remain totally irrelevant to me and I conclude that Mr. Cain's allegation that I am a racist and acted against him because of his Hispanic background is scurrilous.  The same is true of Mr. Cain's allegations that I was racially biased against his family and current girlfriend.  The PSR mentions the names of his brother and sister, his three children, and his current fiancée.  *PSR* ¶¶ 36, 38.  But there is no mention in the PSR (apart from the statement that he is white and Hispanic) of anyone's race or ethnicity, nor should there have been.

Mr. Cain's third accusation, namely that I had ex parte contacts with L.H., the victim in this case, is just plain false.  I have never met L.H. and certainly was never in the same room with the AUSA and the victim without Attorney Tzovarras present.  I do not know what Mr. Cain is talking about when he refers to ex parte contacts.  In fact, I have no memory of ever seeing L.H. and would not recognize her if I saw her

today. At the outset of the sentencing hearing, I asked the AUSA whether she had given proper notice to the victim of the sentencing hearing and she confirmed that she had done so. *Sentencing Tr.* at 2:12-14. I received and read a victim-impact statement, which was admitted into evidence at the sentencing hearing. *See id.* at 34:18-37:7 (referring to the Government's Exhibit 3). If the victim was in the courtroom at the sentencing hearing, I was not made aware of it by either the AUSA or defense counsel, nor was she, to my knowledge, present in the courtroom at any other proceeding in Mr. Cain's case. Although I cannot exclude the possibility she was present at a public hearing, if she was, she was not introduced. She was never at an ex parte hearing because I did not hold any ex parte hearings in Mr. Cain's case.

Contrary to Mr. Cain's quotation, I did not threaten Mr. Cain that he was going to pay for hurting "that young lady." *See Def.'s Reply Sept. Mot.* at 1. Other than the revelation in the PSR that L.H. has a child in the early teens, *PSR* ¶ 14, I have no idea how old L.H. is. There is no such language in any of the transcripts and I am at a loss as to why Mr. Cain believes I said such a thing.

All these factual allegations are false. The quotations appear nowhere in any of the transcripts and I have no memory of doing or saying the things Mr. Cain alleges.

### B. The Attorney Appointment Issue

#### 1. The Factual Backdrop

To expand upon Mr. Cain's accusations about the attorney appointment issue, in his October 2019 motion, Mr. Cain writes:

Judge Woodcock should have dismissed Hunter from case, when he chose to not court appoint him. I was not paying Hunter any more funds for my defense. We had a disagreement on how I wanted to proceed with Trial, Hunter wanted me to plea since I wasn't paying him. He said the fund, I had paid him only covered plea and sentencing. Judge Woodcock allowed David Weyrens and Jeff Silverst[ei]n to resign as counsel for non-payment. He made Hunter stay on telling him prior to me taking plea that, He Judge Woodcock said "he was not going to use tax payer money to court appoint Hunter, he Hunter should have got more money up front, take this as a lesson[] learned and suck it up" Depriving me of my Sixth Amendment Right.

*Def.'s Sept. Letter.*

Mr. Cain badly mischaracterizes what took place. Mr. Cain was not a rich man at the time of his sentencing hearing, but he has been an extremely competent builder with several Walmart certifications as well as OSHA and EPA construction certifications. *PSR* ¶ 45. He was able to earn from $90,000 to $100,000 per year during most of the decade leading up to his crime. *Id.* ¶¶ 46-53. When the Government issued a criminal complaint against Mr. Cain, he retained Attorneys David Weyrens and Michael Whipple and they entered their appearances on February 3, 2016. *Entry of Appearance* (ECF No. 9); *Entry of Appearance* (ECF No. 10). On April 1, 2016, Attorney Weyrens moved to withdraw as defense counsel because Mr. Cain had hired a new lawyer to represent him and because communication had broken down between Mr. Cain and Attorney Weyrens. *Mot. to Withdraw Filed Under Seal Pursuant to Local Rule 157.5(b)* (ECF No. 40). On April 5, 2016, Attorney Whipple moved to withdraw because Attorney Jeffrey Silverstein had entered his appearance on behalf of Mr. Cain. *Mot. to Withdraw Pursuant to Local Rule 157.5(b)* (ECF No. 43). In fact, on April 4, 2016, the day before this motion,

Attorney Silverstein entered his appearance on behalf of Mr. Cain. *Entry of Appearance* (ECF No. 41). I did not appoint Mr. Silverstein to represent Mr. Cain.

Attorney Silverstein continued to represent Mr. Cain after he was indicted on August 9, 2016. *Indictment* (ECF No. 56). On June 14, 2017, Attorney Silverstein filed a motion to withdraw as Mr. Cain's attorney. *Mot. to Withdraw* (ECF No. 119). Attorney Silverstein said that Mr. Cain had failed to fulfill his financial obligations to him and he noted that, if I held a hearing on the motion to withdraw, Mr. Cain would like to appear by videoconference. *Id.* I scheduled the hearing for July 6, 2017, and, after a brief hearing at which Mr. Cain appeared by videoconference, I continued the hearing until July 12, 2017, to allow Mr. Cain time to obtain a new lawyer. *Min. Entry* (ECF No. 122). On July 9, 2017, Attorney Tzovarras entered his appearance as retained counsel on behalf of Mr. Cain. *Entry of Appearance* (ECF No. 125). I did not appoint Mr. Tzovarras to represent Mr. Cain. After Attorney Tzovarras entered his appearance on behalf of Mr. Cain, I granted Attorney Silverstein's motion to withdraw as his lawyer. *Order Granting Mot. to Withdraw* (ECF No. 126).

Attorney Tzovarras continued to represent Mr. Cain and on November 27, 2017, the Clerk's Office set the case for jury trial with jury selection to take place on January 9, 2018, with trial to commence immediately thereafter. *Notice of Hr'g* (ECF No. 135). On January 3, 2018, Attorney Tzovarras moved to continue the jury trial on the ground that Mr. Cain wished to plead guilty to the charged offense. *Def.'s Unopposed Mot. to Continue Trial Date and Extend Trial Br. Filing, and Mot. to Withdraw Prior Mot. to Continue* (ECF No. 143). On the same day, the Clerk's Office

scheduled Mr. Cain for a Rule 11 hearing to enter a guilty plea. *Notice of Hr'g* (ECF No. 144). On January 8, 2018, Attorney Tzovarras filed a motion to have me appoint him as court-appointed counsel. *Def.'s Mot. for Appointment of CJA Counsel* (ECF No. 150) (*Mot. to Appoint*).

At the outset of the Rule 11 hearing the next day, I addressed the motion that I appoint Attorney Tzovarras as court-appointed counsel. *Rule 11 Tr.* at 2:12-7:4. Attorney Tzovarras argued that because his client's financial circumstances had changed for the worse, if he qualified for appointed counsel, I should appoint him to represent Mr. Cain. *Id.* at 2:24-3:1 ("[S]ince he has a change in financial circumstances, he may qualify for court-appointed counsel. If he does, then I would ask the court to appoint me").

I informed Attorney Tzovarras that I would not do so at that time. I explained that it is my view that, like any lawyer, a criminal defense lawyer who takes on representation of a criminal defendant as retained counsel must make a financial arrangement with the client at the outset of representation sufficient for the lawyer to enter an appearance on the client's behalf and to continue to do so until the end of the case. *Id.* at 3:15-25. If the lawyer uses the court-appointed system as a fail-safe for a financial arrangement that does not work, the private lawyer will have little incentive to strike a financial arrangement that assures payment of legal fees. Furthermore, as it is the court, not the lawyer, who appoints defense counsel, the defense lawyer, by making an inadequate arrangement and seeking appointment, would in effect be appointing himself. *Id.* at 3:8-25. I told Attorney Tzovarras that if

a private-paying client fails to pay, the lawyer has the alternative of moving to withdraw as the client's lawyer or continuing to represent the client under the terms of their financial arrangement. *Id.* at 4:1-15. I then reviewed Mr. Cain's financial affidavit and questioned whether he would be capable of paying all or some of Attorney Tzovarras' legal fees. *Id.* at 4:20-5:9.

I also reviewed the financial arrangement that Attorney Tzovarras had made with Mr. Cain, which was submitted with the motion to appoint counsel. *Mot. to Appoint*, Attach. 2, *Retainer and Engagement Letter* at 1-2. The attorney-client arrangement was for Mr. Cain to pay Attorney Tzovarras $2,500 up front and $2,500 per month for three months until he paid $10,000 as a retainer. *Id.* Attorney Tzovarras was authorized to bill against the retainer. *Id.* Attorney Tzovarras represented that Mr. Cain had paid $4,500 toward the initial retainer. *Mot to Appoint* at 1. I told Attorney Tzovarras that, if he wished to do so, I would consider a new motion for appointment once Attorney Tzovarras had "expended the $10,000 that [he] bargained for from [his] own client." *Rule 11 Tr.* at 6:6-8. Furthermore, after reviewing the financial affidavit Mr. Cain submitted, I informed Attorney Tzovarras that I would not appoint counsel based on Mr. Cain's then-current financial status and, if I appointed counsel, I would require Mr. Cain to pay "at least a portion of what he is earning . . . to defray the cost to the United States taxpayer." *Id.* at 5:5-6:5.

Attorney Tzovarras agreed to "see what we can work out, if something can be worked out." *Id.* at 6:17-18. He informed me that he did not "plan to withdraw, and this wasn't something [he] ever planned to - - to do with Mr. Cain." *Id.* at 6:18-19.

Attorney Tzovarras said that if he and Mr. Cain could not work something out and Attorney Tzovarras had to come back to the court, "perhaps [he]'ll do that. If not, [he]'ll just sometimes bite the bullet and finish the case." *Id.* at 6:21-24.

### 2. Discussion

As I understand Mr. Cain's contention, he argues that I treated Attorney Tzovarras differently than I treated Attorneys Weyrens, Whipple, and Silverstein. He is correct. But the reason I treated Attorney Tzovarras differently is that he asked for different treatment. If a private lawyer wishes to withdraw from a case because a client is not paying him, this is a matter between the lawyer and the client and, so long as the criminal defendant is not left without counsel, I typically allow the lawyer to withdraw. This is what I did with Attorneys Weyrens, Whipple, and Silverstein.

However, Attorney Tzovarras asked me to appoint him as Mr. Cain's lawyer because his financial arrangement with Mr. Cain had not worked out. For the reasons I stated on the record, I dismissed the motion without prejudice because I did not believe that Mr. Cain was indigent and because I was concerned about the implications of appointing a retained lawyer as CJA counsel. My position regarding Attorney Tzovarras' request was not new. I have taken the same position in other cases. *See Order Denying Ex Parte Mot. for Appointment of Counsel, United States v. French*, No. 1:12-cr-00160-JAW (ECF No. 345). In rejecting a similar application on April 3, 2014, I wrote in *French*:

> [T]he Court will not order the taxpayer to become an alternative source of funding for lawyers whom the Defendant selected, who struck their own financial deal with the Defendant, and who have represented him throughout this litigation. Under the Maine Rules of Professional

> Conduct, a lawyer may seek to withdraw representation if a client "fails
> substantially to fulfill an obligation to the lawyer regarding the lawyer's
> services," ME. R. PROF. CONDUCT 1.16(a)(5), but neither [defense
> counsel] is moving to withdraw as [the Defendant]'s counsel. They wish
> to continue to represent him but be paid by the taxpayer.

*Id.* at 4. As I applied to Mr. Cain the same principles I applied in other cases, I reject

his allegation that my ruling on the motion for appointment of counsel reflected any

bias against Mr. Cain individually.

Furthermore, as the transcript reveals, I dismissed the motion to appoint

counsel without prejudice. If Attorney Tzovarras or Mr. Cain had wished to do so,

they could have filed a new motion to have Attorney Tzovarras appointed as Mr.

Cain's lawyer. No further application was ever made.

As to Mr. Cain's second point, namely that because Attorney Tzovarras was

not being paid, Attorney Tzovarras forced him to plead guilty when he preferred to

go to trial, during the Rule 11, I asked Mr. Cain numerous questions about whether

he knew what he was doing in pleading guilty and whether he was doing so

voluntarily. He represented to me that he understood those rights and was pleading

guilty because he was actually guilty of the crime and for no other reason:

> THE COURT: Now, Mr. Cain, I have a very important question for you,
> and, obviously, in this courtroom, I require an honest and truthful
> answer. Have you pleaded guilty to the charge contained in Count 1 of
> this indictment because you are actually guilty of that crime and for no
> other reason?

> THE DEFENDANT: Yes, Your Honor.

*Rule 11 Tr.* at 9:12-17. Later, the following interchange took place:

> THE COURT: Now, the next part of this process is for me to make sure
> you're doing what you're doing today of your own free will. Has anyone

threatened you or has anyone attempted to force you to get you in any way to plead guilty?

THE DEFENDANT:  No, Your Honor.

*Id.* at 17:8-12.  I took Mr. Cain at his word and there was no hint that Attorney Tzovarras was pressing Mr. Cain to plead guilty in order to minimize the financial impact of his continued representation of Mr. Cain.

In short, I reject Mr. Cain's allegation that my refusal to appoint Attorney Tzovarras as a CJA lawyer for Mr. Cain is evidence of my bias against him.

## C.    Favoritism to the Prosecutor

In his reply, Mr. Cain contends that I showed favoritism to the Government by complimenting AUSA McElwee, the federal prosecutor in this case:

> Judge Woodcock must [k]no[w] the Court may not aid prosecution-violation of ABA Rules yet, when AUSA McElwee said she took my plea at such a late notice because she was not ready for trial, Judge Woodcock said "Oh I can't believe that[;] you['re] always prepared way in advance" . . ..

*Def.'s Reply Sept. Mot.* at 2.

Again, Mr. Cain misquotes what was said and misses its context.  The plea agreement in this case contained a recommendation that I find Mr. Cain obstructed justice and merited a two-level enhancement under United States Sentencing Guideline (USSG) § 3C1.1 and it recommended that he should receive a three-level reduction for acceptance of responsibility under USSG § 3E1.1.  *Agreement to Plead Guilty (with Stips. and Appeal Wavier)* at 2 (ECF No. 151).  Despite the terms of the plea agreement, at the sentencing hearing, I ruled in favor of Mr. Cain on the issue

of whether he obstructed justice under USSG § 3C1.1, concluding that he did not.[4]
*Sentencing Tr.* at 6:17-15:10.

I turned to the parties' recommendation that Mr. Cain receive a three-level reduction under USSG § 3E1.1 for acceptance of responsibility. *Id.* at 15:11-32:11. While discussing whether Mr. Cain should receive acceptance of responsibility, AUSA McElwee explained why she agreed with Mr. Cain's counsel to recommend in the plea agreement that I should grant Mr. Cain acceptance of responsibility:

> MS. MCELWEE: And so then the week before jury selection, the question came from Mr. Tzovarras, would you be willing to give him acceptance? And we had not prepared for trial yet. We had not officially sat down. I had written my trial brief, which is usually my personal - - is usually my personal - - and let me - - let me explain what I mean by that.
>
> THE COURT: Ms. McElwee, you - -
>
> MS. MCELWEE: Let me explain what I mean by that because I understand why you're making that face. My - -
>
> THE COURT: I don't believe it. I believe that you prepare for trial when you first get the file and you start preparing - -
>
> MS. MCELWEE: Well, there's - -
>
> THE COURT: - - throughout the course of the case.
>
> MS MCELWEE: That's certainly fair, Judge.

*Id.* at 20:4-18.

---

[4]    In his recusal papers, Mr. Cain never mentions that I rejected the recommendation of the parties, including his own recommendation, that he receive a two-level enhancement under the Guidelines for obstruction of justice under USSG § 3C1.1. I also accepted the recommendations of the parties and granted Mr. Cain acceptance of responsibility, despite the fact he had violated his bail conditions in Nevada. Mr. Cain does not mention rulings favorable to him.

I reject Mr. Cain's assertion that this colloquy reflects any bias on my part. First, I was expressing skepticism, not favoritism, about the AUSA's statement to me about the reason she agreed to recommend acceptance of responsibility. Second, I was correcting her statement that she had not begun to prepare for trial a week before jury selection because in my experience as a former trial lawyer, lawyers prepare for trial throughout the time they handle cases, a point on which the AUSA agreed. Third, this compliment, to the extent it was a compliment and not an observation about the practice of law, is benign and oblique. Fourth, I try to compliment lawyers, including prosecutors, whenever they do something well. Compliments from the bench to the bar encourage and reward high standards of practice. Judicial compliments do not mean that I am biased in favor or against the party; they only mean I recognize a well-presented argument. Finally, I praised Attorney Tzovarras himself. At Mr. Cain's Rule 11 proceeding, I stated directly to Mr. Cain: "Mr. Tzovarras is a very fine lawyer . . .." *Rule 11 Tr.* at 29:2. My more direct praise of Mr. Tzovarras did not mean that I favored Mr. Cain over the prosecution and my statements to AUSA McElwee did not mean that I favored the prosecution over Mr. Cain.

### D.     Timing Issue

Mr. Cain alleges that I demonstrated bias when I said at the end of the revocation hearing that "'it's just a matter of time when Mr. Cain starts serving his time May 25, 2018 or June 28, 2018' he hadn't even seen the PSR yet." *Def.'s Reply Sept. Mot.* at 2. Mr. Cain is in error. The PSR was prepared initially on March 9,

2018, and was revised on April 6, 2018. *PSR* at 1. After receiving the PSR, I held the first presentence conference with counsel on May 8, 2018. *Min. Entry* (ECF No. 165). At that time, the Probation Office calculated Mr. Cain's guideline sentence range at fifty-one to sixty-three months. *PSR* ¶ 56. Mr. Cain is simply wrong when he claims that I had not seen the PSR by the May 25, 2018, revocation hearing. *Min. Entry* (ECF No. 177).

I did not make the comment Mr. Cain alleges at the revocation hearing, but in my June 1, 2018, order, I wrote:

> A bail revocation, particularly in the pre-sentencing context, is a step removed from a parole or supervised release revocation. For individuals like Mr. Cain, who pleaded guilty and are awaiting sentence, the statute reverses the presumption of release in § 3142 and generally requires a court to incarcerate a defendant pending the imposition of sentence. 18 U.S.C. § 3143(a) ("Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community. . ."). An exception exists where the person's guideline sentence "does not recommend a term of imprisonment", 18 U.S.C. § 3143(a), or where the person's recommended guideline range is less than the total time the person has or will spend in custody before the imposition of sentence.
>
> Neither is applicable here. Mr. Cain was arrested on January 21, 2016 and detained until February 17, 2016, when he was released. [*PSR*] at 1. His sentencing hearing is already scheduled for June 28, 2018. Under the applicable guideline, Mr. Cain faces a sentence of fifty-one to sixty-three months. *Id.* ¶ 56. Mr. Cain is not at risk of overstaying his sentence as a result of a bail revocation. Therefore, a bail revocation for Mr. Cain is not an additional punishment; it is only a question of timing, namely when he starts the sentence, May 25, 2018 or June 28, 2018. In these circumstances, there is even less of an argument that a defendant subject to bail revocation has the Constitutional rights that Mr. Cain is asserting.

*Detention Order on Mot. to Revoke Bail* at 14-15 (ECF No. 183) (*Detention Order*) (emphasis added).

The context of the comment was (1) 18 U.S.C. § 3143(a) requires that a person who has pleaded guilty to a crime be detained unless the guideline sentence does not recommend a term of incarceration (which was not the case here) or unless the recommended guideline sentence was less than the total time the person had spent or would spend in custody before sentence was imposed; (2) the recommended guideline sentence was fifty-one to sixty-three months; (3) Mr. Cain had spent a little over one month in custody, *see PSR* at 1; (4) his sentencing hearing had been scheduled for June 28, 2018, when he would have been at least subject to immediate incarceration; and (5) the length of time between the date of the revocation hearing, May 25, 2018, and the sentencing hearing, June 28, 2018, would not raise a concern that he was going to spend more time in jail than his sentence, when imposed, would justify.

My written comment reflects my concern for Mr. Cain's rights, namely that he not spend more time in prison than the length of his sentence. It does not reflect any bias against him.

### E. Judicial Scolding at the Bail Revocation Hearing

In his reply, Mr. Cain writes:

> The Bias I suffered from Judge Woodcock was not from his judicial rulings, but from his action in the courtroom, he never let m[y] counsel speak always yelling at him and telling him to sit down and shut up, stating that he could have been enjoying his family and evening instead of reading his meaning my attorney, Hunter Tzovarras's friv[o]lous motion[s].

*Def.'s Reply Sept. Mot.* at 1. Mr. Cain is correct that I was highly irritated with Attorney Tzovarras for presenting what I considered and still consider a frivolous argument about a bailee's right to a full evidentiary hearing and full due process at a bail revocation hearing. It serves no useful purpose to revisit the issue. Right after the bail revocation hearing, I issued a twenty-one-page order that explains in detail why I thought Attorney Tzovarras' argument was meritless. *Detention Order* at 1-21.

Part of my irritation was timing. Mr. Cain had been released on pre-sentence bail on January 9, 2018, with no-alcohol and no-new-crimes conditions. *Id.* at 3. As mentioned before, the PSR had been completed when I held a presentence conference with counsel on May 8, 2018, at which I set the sentencing hearing for June 28, 2018. *Id.* On April 26, 2018, the Government filed an ex parte motion for issuance of an arrest warrant claiming that Mr. Cain violated the no-alcohol and no-new-crimes bail provisions by drinking alcohol and driving under the influence in Las Vegas, Nevada. *Id.* at 4. The same day, the Government moved to revoke Mr. Cain's bail and on May 10, 2018, the Clerk's Office set the revocation hearing for May 25, 2018. *Id.*

On May 22, 2018, Mr. Tzovarras moved to continue the hearing, claiming that he had not received the blood alcohol test results and that he was entitled to present a "complete defense" at the bail revocation hearing. *Id.* I scheduled a telephone conference with counsel the next day. *Id.* At the telephone conference on May 23, 2018, Attorney Tzovarras announced that "a bail revocation hearing requires full due process, that the Rules of Evidence must be applied, and that a defendant has the

right to confront witnesses against him." *Id.* at 5. I ordered the Government and Attorney Tzovarras to submit immediate memoranda on this newly-pressed legal issue and they submitted memoranda by 5:00 p.m. on May 24, 2018, the afternoon before the scheduled revocation hearing. *Id.* I thought that if Attorney Tzovarras wanted to make an argument plowing new legal ground, he should have filed something earlier than the night before the hearing.

Although it is difficult for Mr. Cain as a non-lawyer to appreciate, I viewed as entirely frivolous Mr. Tzovarras' argument that to revoke post-conviction bail, I had to accord a defendant a full due process hearing complete with the Rules of Evidence and application of the Confrontation Clause. I am still of that view. None of the cases that Attorney Tzovarras cited stands for the proposition he raised in his argument, and his argument ran counter to Supreme Court authority and common sense. I was not pleased that Attorney Tzovarras was belatedly pressing an unwarranted argument and I pressed him hard to justify it. Although I reject Mr. Cain's accusation that I yelled at Attorney Tzovarras, I agree that I questioned him closely. Even so, my questioning of Attorney Tzovarras had nothing to do with Mr. Cain as a person. It was based solely on his lawyer making an argument I considered contrary to law, unjustified, and designed to scuttle the hearing so that bail would not be revoked until the sentencing set a month later. I would have reacted the same way had he or another attorney used the same tactic to press the same argument for a different client.

### F. Accord and Satisfaction and Accusation of Being Delusional

In his October motion, Mr. Cain writes:

> The only remedy this Court can give Donald Cain is to DISMISS THE
> INDICTMENT AND VACATE THE JUDGMENT IN Case # 1:16-cr-
> 00103-JAW, because the UNITED STATES DISTRICT COURT did not
> have any jurisdiction to proceed to prosecute this case when the State of
> Maine, where all claims were initiated, had already dismissed the State
> Case because of the Accord and Satisfaction that was completed/Filed
> by [LH], the alleged victim in this Case number. This case was initiated
> by and with corrupt intent as alleged in my Habeas Corpus. This Court
> deemed Me, Donald Cain "delusional" when I informed the Court, Judge
> John A. Woodcock there was an Accord and Satisfaction, that
> mysteriously disappeared, but has resurfaced after the Void Judgment
> issued in this case.

*Def.'s Oct. Mot.* at 1. On October 9, 2019, Mr. Cain filed an accord and satisfaction

dated April 28, 2015, in which the victim in this case released Mr. Cain from all claims

arising out of a Harassment by Telephone charge allegedly occurring before February

12, 2015, pending before the Maine District Court in Houlton under Docket Number

HOUDC-CR-2015-97. *Attached Addendum of Accord and Satisfaction as Ex. in 28*

*USC § 2255* at 3-4 (ECF No. 222).

I had no memory of a claim by Mr. Cain that L.H., the victim in his case, had

signed an accord and satisfaction that affected federal jurisdiction. To refresh my

recollection, I reviewed the PSR. Paragraph 33 of the PSR describes a Harassment

by Telephone charge that had been brought in the Maine District Court in Houlton,

Maine, which resulted in Mr. Cain's arrest on March 4, 2015, and that the state of

Maine dismissed on April 27, 2015. *PSR* ¶ 33. There is a reference in paragraph 33

that on April 27, 2015, L.H. signed an accord and satisfaction pursuant to Title 15,

section 891 of the Maine Revised Statutes,[5] in which she acknowledged satisfaction for all injuries occasioned by the charged conduct and acknowledged that the state court would stay further proceedings and dismiss the charge. *Id.*

To my knowledge, other than the reference in the PSR, the dismissed state charge and accord and satisfaction were never raised in my dealings with Mr. Cain. There is no mention of the accord and satisfaction in the sentencing memoranda or in any of the transcripts of my courtroom proceedings with Mr. Cain. I did not mention this dismissed charge during the sentencing hearing when I reviewed Mr. Cain's criminal history. *Sentencing Tr.* at 65:24-66:3.

The only reference to an accord and satisfaction that I found in the case was in Mr. Cain's testimony in a motion to suppress evidence before Magistrate Judge Nivison. *Tr. of Proceedings*, *Mot. to Suppress* at 129:23-130:18 (ECF No. 124) (*Mot. to Suppress Tr.*). Mr. Cain explained to the Magistrate Judge the circumstances of his arrest in South Carolina for the federal offense and his surprise that he was being

---

[5]    Title 15, section 891(1) of the Maine Revised Statutes provides in pertinent part:

> When a person is charged with a Class D or Class E crime . . . for which the party injured has a remedy by civil action, if the injured party appears before the court and in writing acknowledges satisfaction for the injury, the court, on payment of all costs, may dismiss the charge.

15 M.R.S. § 891(1). By its terms this state provision does not bar a federal prosecution for stalking, a violation of 18 U.S.C. § 2261A(2)(B). In fact, a state court has no authority under this statute to dismiss a state of Maine Class A through C crime, much less a federal felony. *See State v. Young*, 476 A.2d 186 (Me. 1984).

Moreover, the statute has exceptions; one is "any crime . . . in which the alleged victim is a family or household member as defined in Title 19-A, chapter 101." 15 M.R.S. § 891(2). Chapter 101 contains a definition of "family or household members" that includes a "spouse." 19-A M.R.S. § 4002(4). According to the PSR, Mr. Cain and L.H. were married from August 2014 through around Halloween 2016. *PSR* ¶ 38. In light of the statutory exception, it is unknown what impact, if any, the accord and satisfaction had in the dismissal of the harassment by telephone charge on April 27, 2015.

However, I do not reach these issues, which are raised in the pending habeas corpus petition.

arrested for something he thought had been resolved in Maine. *Id.* at 129:23-130:18, 136:22-23. But the accord and satisfaction did not form the basis of his motion to suppress. *See Def.'s Mem. re: the Facts Presented at Suppression Hr'g* (ECF No. 111); *Recommended Decision on Def.'s Mot. to Suppress* (ECF No. 116).

Finally, I found no suggestion in the transcripts that I called Mr. Cain delusional or, for that matter, that the Magistrate Judge did so. I have no idea why he believes I used this language.

### G.    Eighth Amendment Claim

I reject the notion that I should recuse myself because Mr. Cain now claims that his sentence violates the Cruel and Unusual Punishment Clause of the United States Constitution. Typically, the sentencing judge addresses an inmate's § 2255 petition, and there is no reason to conclude that, if preserved, I cannot properly analyze such an argument, if one is made in the petition, which at least in my reading, it has not been.

### H.    Pending Judicial Misconduct Complaint

I also disagree with Mr. Cain's claim that I must recuse myself because he filed a judicial misconduct complaint against me with the Court of Appeals for the First Circuit. It strikes me that if a litigant could force a judge's recusal merely by filing a judicial misconduct complaint against the judge, this would run counter to the First Circuit's admonition that a "defendant's claim and its implications cannot themselves alone suffice to require the judge's recusal, lest the law confer a veto power on the assignment of his trial judge to any heckling defendant who merely levels a charge

that implicates a judge's defensive or vicariously defensive reaction." *In re Bulger*, 710 F.3d at 46-47.

## I. Plea Negotiations

Mr. Cain charges that I was aware of plea negotiations between AUSA McElwee and Attorney Tzovarras. This is false. Federal Rule of Criminal Procedure 11(c)(1) provides that the "court must not participate in these discussions." I followed Rule 11(c)(1) and did not participate in any plea agreement negotiations between the prosecutor and Mr. Cain's defense lawyer.

## J. Competence During Sentencing Hearing

Mr. Cain claims that he was not competent during his sentencing hearing and that he "made it clear" that he was on medicine that was making him dizzy and lightheaded. *Def.'s Reply Sept. Mot.* at 9. He also asserts that he was unable to compose himself during his statement to me at the sentencing hearing. *Id.*

Mr. Cain's claim is contradicted by the sentencing transcript. At the sentencing hearing, Mr. Cain provided me with a list of his medications. *Sentencing Tr.* at 4:6-5:7; *Ct. Ex. List* (ECF No. 196). I specifically asked him whether the medications, alone or in combination, had any impact on his ability to understand the proceedings, and Mr. Cain assured me that they did not. *Sentencing Tr.* at 4:12-20. Mr. Cain engaged in a long and detailed allocution. *Id.* at 58:6-61:7.

At no time during the sentencing hearing did either Mr. Cain or Attorney Tzovarras express any concern about Mr. Cain's competence to proceed with the

hearing. Nor did I see any hint that Mr. Cain was suffering in any way from the dizziness, lightheadedness, or inability to articulate that he now claims.

### K. Plea Coercion

Mr. Cain now claims that Attorney Tzovarras coerced him into pleading guilty when all along he wanted a jury trial. *Def.'s Sept. Letter* at 1. This claim is the first I have heard of any alleged coercion and I do not understand why Attorney Tzovarras' advice to Mr. Cain should be a ground for my recusal. I reject Mr. Cain's blanket assertion that Attorney Tzovarras put his personal financial interests above his professional obligations to his client.

In any event, as discussed above, the notion of a coerced plea is contradicted by the Rule 11 record during which I directly asked Mr. Cain whether he was doing what he was doing of his own free will, whether he was pleading guilty because he was actually guilty of the crime and for no other reason, and whether he understood that he was giving up his right to trial by jury, and Mr. Cain expressly assured me that he understood what he was doing and was doing it voluntarily. *Rule 11 Tr.* at 7:5-13; 9:12-17; 13:5-13. Furthermore, Mr. Cain specifically denied that anyone had threatened him or attempted to coerce him into pleading guilty. *Id.* at 17:10-12. "It is the policy of the law to hold litigants to their assurances." *United States v. Parrilla-Tirado*, 22 F.3d 368, 373 (1st Cir. 1994).

## V. CONCLUSION

To the extent the motion demands my recusal, I DENY Donald Cain's Motion Pursuant to 28 USC § 455 to Disqualify USDJ John A. Woodcock and USMJ John

Nivison in Above Case and Pending § USC 2255 Transferred from USDC Fort Worth, Texas (ECF No. 216). I refer to Magistrate Judge Nivison that part of the motion that demands he recuse himself.

I DENY in part and DEFER in part his Motion to Remove Judge Woodcock from Case and Motion that No Strike Be Applied re 2255 (ECF No. 223). I deny that part of the motion that demands my recusal, but I have not reached whether Donald Cain's pending motion should be treated as a strike under 28 U.S.C. § 2255.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 7th day of January, 2020