UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:16-cr-00103-JAW-1 |
| | ) | |
| DONALD CAIN | ) | |

ORDER ON SECOND AMENDED MOTION
FOR COMPASSIONATE RELEASE

A prisoner serving a sixty-month sentence for stalking in violation of 18 U.S.C.
§ 2261A(2)(B) moves for a modification of his sentence and compassionate release
under 18 U.S.C. § 3582(c)(1)(A)(i).  The Court concludes that the seriousness of the
prisoner's offense and the continuing danger he poses to the public weigh against
releasing him, even though his medical conditions and the danger of contracting
COVID-19 favor his release.  The Court dismisses the motion without prejudice.

I.     PROCEDURAL BACKGROUND

On July 19, 2018, after Donald Cain's conviction for stalking in violation of 18
U.S.C. § 2261A(2)(B), the Court sentenced him to sixty months of incarceration, three
years of supervised release, a $100 special assessment, and no fine.  *J.* (ECF No. 197).
Mr. Cain filed a notice of appeal to the United States Court of Appeals for the First
Circuit on July 27, 2018.  *Notice of Appeal* (ECF No. 199).  The First Circuit affirmed
this Court on July 1, 2019.  *J.* (ECF No. 212).  Due to the ongoing COVID-19
pandemic, Mr. Cain filed an emergency motion for compassionate release on April 22,
2020.  *Emergency Mot. for Compassionate Release per "First Step Act" 3582(c)(1)(A)*
(ECF No. 244) (*Emer. Mot.*).  The Court dismissed the emergency motion without

prejudice on June 9, 2020 because Mr. Cain had failed to show that his motion was timely under 18 U.S.C. § 3582(c)(1)(A). *Order on Emergency Mot. for Compassionate Release* (ECF No. 252).

Eight days later, on June 17, 2020, the Court received a renewed pro se motion for compassionate release from Mr. Cain. *Renewed Mot. for Compassionate Release* (ECF No. 253) (*Def.'s Renewed Mot.*). The Court appointed counsel for Mr. Cain on July 8, 2020. *Appointment of Counsel & Scheduling Order* (ECF No. 256). Through counsel, Mr. Cain filed an amended renewed motion for compassionate release on July 14, 2020. *Def.'s Am. Renewed Mot. for Compassionate Release* (ECF 257) (*Def.'s Mot.*). Once again, on August 11, 2020, the Court found that the motion was not timely under 18 U.S.C. § 3582(c)(1)(A). *Order on Mot. for Compassionate Release* (ECF No. 262) (*Order on Am. Renewed Mot.*). The Court dismissed the motion without prejudice to permit Mr. Cain to "unequivocally establish that he has complied with the mandatory exhaustion of remedies provision of the First Step Act . . .." *Id.* at 7.

Mr. Cain again moved for compassionate release on September 21, 2020. *Def.'s Second Am. Renewed Mot. for Compassionate Release* (ECF No. 264) (*Def.'s Second Am. Mot.*). He incorporated his prior arguments and exhibits by reference. *Id.* at 2. On September 29, 2020 the Government responded. *Gov't Resp. in Opp'n to Def.'s Second Am. Renewed Mot. for Compassionate Release* (ECF No. 267) (*Gov't Opp'n*). To correct an error, the Government filed a supplemental memorandum on October 1, 2020. *Suppl. Mem. in Supp. of Gov't Resp. in Opp'n to Def.'s Second Am. Renewed*

*Mot. for Compassionate Release* (ECF No. 268) (*Gov't's Suppl. Mem.*).  On October 1,

2020, Mr. Cain waived the right to file a reply.

## II.    THE PARTIES' POSITIONS

### A.    Donald Cain's Motion

#### 1.    Exhaustion

Mr. Cain's most recent motion recounts the actions that his then-lawyer,

Attorney MacLean,[1] took after the Court's August 11, 2020 order.   *Second Am. Mot.*

at 1-3.  It indicates that Attorney MacLean contacted the Bureau of Prisons (BOP) to

determine "how to effect service of [Mr.] Cain's RIS request on the BOP in FCI

Oakdale I."  *Id.* at 1.  The BOP instructed Attorney MacLean to email the Oakdale

Executive Assistant email inbox, which he did on August 19, 2020.  *Id.* at 1-2.

Attorney MacLean states he then submitted "an RIS from Donald Cain dated August

10, 2020, requesting home confinement pursuant to the First Step Act."  *Id.* at 2.  He

attached the correspondence, attachment, and verification of email service.  *Id.*,

Attach. 1, *Attorney MacLean Email and Attachs.* (ECF No. 264).  The attachment

confirms that on August 19, 2020, Attorney MacLean's legal assistant submitted, via

email, a letter to the Oakdale Executive Assistant and a copy of a handwritten

request Mr. Cain made to his "Unit Team and Warden" for home confinement and

compassionate release on August 10, 2020.  *Id.*  at 1-3.  Therefore, Mr. Cain contends

---

[1]       On November 13, 2020, Attorney MacLean moved to withdraw as Mr. Cain's counsel.  *Mot. to Withdraw as Counsel for Def.* (ECF No. 275).  With that motion pending, Mr. Cain moved to proceed pro se, stating "I would like to continue Pro Se, since we are just waiting on [the] judge[']s decision, I started this thing by myself, I can finish it myself . . .."  *Mot.* (ECF No. 278).  The Court granted Mr. Cain's motion to proceed pro se and dismissed as moot Attorney MacLean's motion to withdraw.  *Order* (ECF No. 279).

that his motion for compassionate release is now timely because thirty days lapsed between August 19, 2020, the date Attorney MacLean submitted this information to the BOP, and September 21, 2020, the date Mr. Cain filed his most recent motion. *Second Am. Mot.* at 2-3.

### 2.    The Merits

Mr. Cain's latest motion incorporates his prior arguments and exhibits by reference. *Id.* at 2-3. These arguments come from Mr. Cain's First Amended Renewed Motion for Compassionate Release. *Def.'s Mot.* at 1-7. On the merits, Mr. Cain contends that the COVID-19 pandemic in combination with his underlying health conditions and BOP incarceration present an "extraordinary and compelling reason" that warrants a sentencing reduction under 18 U.S.C. § 3582(c)(1)(A)(i). *Id.* at 2 ("The combination of the COVID-19 pandemic and [Mr.] Cain's medical conditions–which include Type 2 Diabetes, hyperlipidemia, syncope episodes, obesity, high cholesterol, adrenal insufficiency, and hypertension—constitute extraordinary and compelling reasons for [Mr.] Cain's release").

First, Mr. Cain addresses conditions within the BOP and FCI Oakdale, where he is incarcerated. *Id.* at 3. He cites *United States v. Ramirez*, 459 F. Supp. 3d 333, 335 (D. Mass. May 12, 2020) for the proposition that "COVID-19 is particularly contagious in prisons because inmates are forced into close quarters without access to personal protective equipment." *Id.* (internal quotations omitted). He also cites a newspaper article from early April 2020 which describes FCI Oakdale as a "a focal point of the coronavirus pandemic inside the nation's lockups." *Id.* (internal citation

4

omitted). According to reports from Mr. Cain, more than three-hundred inmates at FCI Oakdale tested positive during a two-week span in May and "[t]he lack of physical distancing inherent in a prison environment amplifies the potential for the transmission of COVID-19 inside FCI-Oakdale." *Id.* at 3-4. Mr. Cain cites his First Renewed Motion, in which he "noted that there is roughly a foot between the three bunkbeds in his cell–far less than the recommended six feet of social distancing." *Id.* at 4 (citing *Def.'s Renewed Mot.* at 2-3). He also states that "a previously infected individual was placed in his 15 x 12 foot cell." *Id.* (citing *Def.'s Renewed Mot.* at 3).

Second, Mr. Cain describes various medical conditions that he suffers from. *Id.* at 5. He claims that these "place him at a grave risk of serious complications or death should he contract COVID-19." *Id.* Citing information from the Centers for Disease Control's (CDC) website, he avers that his underlying health conditions, which include Type 2 Diabetes, hyperlipidemia, syncope episodes, obesity, high cholesterol, adrenal insufficiently, and hypertension, put him at a higher risk of complications from COVID-19 than the average person. *Id.* All told, he says that the conditions of his confinement at FCI Oakdale and his medical conditions present an "extraordinary and compelling reasons" which "warrant [Mr.] Cain's release." *Id.* at 6. He suggests that he "will no doubt be far safer if he is released to self-quarantine at the home of his daughter in Wyoming . . .." *Id.*

Third, Mr. Cain argues that his release does not pose a danger to the public. *Id.* He states that although his "conduct was reprehensible, any risk of recidivism could be easily addressed through the imposition of strict conditions of supervised

release prohibiting phone and computer access." *Id.* He also observes that his "conduct, while appalling, did not involve any actual violence against the victim," that he "has never been convicted of a violent crime," that "his criminal history score is 1," and that he has had no disciplinary reports since entering BOP custody. *Id.* Thus, he concludes that modifying his sentence to a term of home confinement is warranted. *Id.* at 7.

### B. The Government's Opposition

The Government opposes Mr. Cain's motion for compassionate release. Before addressing the substance of Mr. Cain's claim for release, the Government recounts the procedural posture of the case, the BOP's efforts to combat COVID-19, and the legal standard for deciding motions for compassionate release. *Gov't's Opp'n* at 1-9.

### 1. Exhaustion

The Government concedes that Mr. Cain has met 18 U.S.C. § 3582(c)(1)(A)'s hybrid exhaustion requirement because thirty days have lapsed since Mr. Cain petitioned the warden at FCI Oakdale to move for his release to home confinement. *Id.* at 10-11. While acknowledging that "[t]he Government has previously argued that the requirements for filing a sentence-reduction motion . . . are properly viewed as jurisdictional" the Government informs that Court that it "now takes the position that the exhaustion requirement of § 3582(c)(1)(A) is a mandatory non-jurisdictional claim-processing rule." *Id.* at 11. Thus, "the Government concedes that more than thirty days passed between the [Mr. Cain's] August 19, 2020 request to BOP for relief under § 3582(c)(1)(A) and the filing of his Motion on September 21, 2020." *Id.* at 12.

6

2.    **The Merits**

The Government argues that the Court should deny Mr. Cain's motion, despite its timeliness. *Id.* at 13. Citing 18 U.S.C. § 3582(c), the Government notes that "a court can grant a sentence reduction only if 'extraordinary and compelling reasons' justify the reduction and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *Id.* It contends that "[t]he mere existence of the COVID-19 pandemic, which poses a threat to every non-immune person in the country" is outside the ambit of the policy statement and therefore release is improper. *Id.* The Government cites *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), to bolster its argument that the threat of COVID-19 is not, by itself, an extraordinary and compelling reason to release a prisoner under 18 U.S.C. § 3582(c)(1)(A)(i).

The Government turns to Mr. Cain's medical history. It notes that Mr. Cain suggested that he has several medical conditions, which put him at increased risk for complications from COVID-19. *Id.* at 14. Those conditions include: diabetes, obesity, heart problems and "unspecified 'other ailments.'" *Id.* The Government also observes that although Mr. Cain has stated he has hyperlipidemia, syncope episodes, obesity, high cholesterol, adrenal insufficiency, and hypertension, the CDC has not identified those "as conditions increasing, or potentially increasing, an individual's risk of severe illness from COVID-19." *Id.*

On Mr. Cain's obesity, the Government avers that "[r]ecords from 2020 do not appear to identify a current official diagnosis of obesity." *Id.* (citing *id.*, Attach. 2,

*Bureau of Prisons Health Services Clinical Encounter*, at 3, 23-24 (ECF No. 267) (*Sept. 2020 Medical Records*)).  However, the Government notes that medical records from 2019 show Mr. Cain had a body mass index (BMI) above thirty, making him obese and therefore at increased risk of complications from COVID-19.  *Id.* (citing *Resp. in Opp'n to Def.'s Am. Renewed Mot. for Compassionate Release*, Attach. 5, *Bureau of Prisons Health Servs. Clinical Encounter*, at 7, 46 (ECF No. 260) (*2019 Medical Records*)).  The Government agrees that Mr. Cain's medical records show that he has Type 2 Diabetes and hypertension.  *Id.* at 15 (citing *Sept. 2020 Medical Records* at 23-24 and *Resp. in Opp'n to Def.'s Am. Renewed Mot. for Compassionate Release*, Attach. 4, *Bureau of Prisons Health Servs Clinical Encounter – Administrative Note*, at 17, 23 (*2020 Medical Records*)).

The Government concedes that although obesity, Type 2 Diabetes and hypertension "would not establish extraordinary and compelling reasons" in ordinary times, the COVID-19 pandemic increases the risk of serious injury or death and therefore brings Mr. Cain within the relevant policy statement's scope.  *Id.* at 15-16.

Even though the Government concedes Mr. Cain's motion is timely and that his medical conditions constitute an extraordinary and compelling circumstance, it contends that Mr. Cain is too dangerous to be released.  *Id.* at 16.  It reminds the Court of Mr. Cain's "unrelenting and vicious campaign of harassment."  *Id.* Specifically, the Government states that Mr. Cain "contacted his victim's employers, accused her ex-husband of sexually abusing a child, threatened to shoot her mother, and went after her sister and her sister's children."  *Id.* at 17.  Moreover, he

threatened to rape the victim's daughter, kill all three of the victim's children, and harassed her children's schools. *Id.* He also threatened law enforcement officers. *Id.* According to the Government, these facts, along with the fact that the defendant has proven himself unable to comply with court-imposed restrictions on his conduct, render supervised release and home confinement unworkable and "no substitute for [Mr. Cain's] imprisonment." *See id.* (discussing how Mr. Cain violated a protection from harassment order by attempting to contact the victim 222 times in one day alone). In addition, the Government cites several other filings by Mr. Cain and concludes that he "has continued to display, at best, an utter disregard for the severity of his conduct. At worst, he appears to deny that his conduct occurred at all." *Id.* at 18.

Shifting to the sentencing factors under 18 U.S.C. § 3553(a), the Government argues that "[t]hose factors strongly disfavor a sentence reduction." It reminds the Court that rather than impose a guideline sentence on Mr. Cain, "the Court imposed the statutory maximum sentence of sixty months." *Id.* at 19. The Government argues that the Court's determination about the seriousness of Mr. Cain's offense, the need to protect the public, and the need for just punishment preclude releasing Mr. Cain. *Id.* at 19-20. Thus, the Government concludes releasing Mr. Cain to home confinement is improper. *Id.* at 19.

### C.     The Government's Supplemental Memorandum

After the Government filed its opposition, in which it described phase seven of the BOP's COVID-19 action plan, it learned that the BOP "is actually in Phase Nine of its Action Plan." *Gov't's Suppl. Mem.* at 1.  The Government summarizes what this means.

Under Phase Nine, the BOP suspended non-essential staff travel and limited access to BOP facilities by outsiders.  *Id.* at 1-2.  In addition, the BOP imposed symptom checks and other screening requirements upon those entering BOP facilities, including BOP staff.  *Id.* at 2.  Now, "inmates are generally limited in their movement, affording limited group gathering with attention to social distancing to [sic] extent possible."  *Id.*  Inmate recreational activities have resumed but with restrictions.  *Id.*

The BOP established new procedures for processing new arrivals at their facilities.  *Id.* at 3.  Initially, new arrivals are quarantined, though the BOP is working to discontinue that process.  *Id.*  All new arrivals are screened for COVID-19 and placed in isolation if they test positive.  *Id.*  Inmates the BOP transfers between facilities are treated as if they are new inmates within the BOP.  *Id.* at 3-4.  The Government anticipates the BOP will make further revisions to its policies as the pandemic progresses.  *Id.*

## III.   LEGAL STANDARD

In relevant part, 18 U.S.C. § 3582(c)(1)(A)(i) states:

The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a

failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . ..

Before a court considers a defendant's motion for compassionate release, it must determine that the defendant has met the procedural prerequisites for bringing such a motion. *See United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (finding the exhaustion or thirty-day requirement of section 3582(c) mandatory). When, as here, a defendant shows exhaustion, a court must consider the merits and determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." 18 U.S.C. § 3582(c)(1)(A)(i).

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A). The Guidelines note that the movant must meet the "requirements of subdivision (2) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Subdivision (2) provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . .."

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a

11

request for compassionate release.  They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  Regarding the history and characteristics of the person, the statute provides that the court must consider:

> (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . ..

18 U.S.C. § 3142(g)(3)(A-B).

After a court has determined whether the defendant is dangerous, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant.  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018).  The policy statement provides that "extraordinary and compelling reasons" may exist under any of the following circumstances:

> (A)  **Medical Condition of the Defendant.—**

(i)     The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

(I)     suffering from a serious medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   **Age of the Defendant.—** The defendant (i) is at least 65 years old; is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   **Family Circumstances**.—

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   **Other Reasons.—** As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

13

*Id.* § 1B1.13 cmt. N.1(A-D). The policy statement also provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2. Lastly, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citations omitted)).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

When it sentenced Mr. Cain, the Court relied on a presentence investigation report (PSR), which U.S. Probation and Pretrial Services (PO) prepared. *Tr. of Proceedings* at 6:8-10 (ECF No. 210) (*Sentencing Tr.*). Mr. Cain confirmed the PSR is factually accurate. *Id.* at 6:12-15. Therefore, the Court relies on the PSR here.

#### 1.   Donald Cain's History and Characteristics

Donald Lee Cain was born in October of 1968 in Cheyenne, Wyoming. *Second Revised Presentence Investigation Report* ¶ 36 (ECF No. 255) (*PSR*). He has two siblings and was raised in Cheyenne by his parents, Virginia and Harvey. *Id.* ¶¶36-

14

37.  According to Mr. Cain, he grew up in a "happy and loving family."  *Id.* ¶37.  He never graduated high school.  *Id.* ¶ 44.  He reports he took a course in construction management at Laramie County Community College (LCCC).  *Id.* ¶ 45.

Mr. Cain had a relationship for twenty-five years with a woman named April Kumer.  *Id.* ¶ 38.  At the time of his sentencing he had three children and six grandchildren.  *Id.*  Mr. Cain married a woman named L.H. on August 22, 2014.  *Id.*  The couple separated after only a few months of marriage.  *Id.*  Mr. Cain claims that he filed for divorce on April 15, 2015, L.H. filed for divorce on May 22, 2015, and the divorce was finalized around Halloween 2016.  *Id.*  However, the PO obtained evidence that L.H. initially filed for divorce, Mr. Cain appealed, and the divorce became final on July 27, 2016.  *Id.*  The couple had no children together.  *Id.*  Mr. Cain was engaged to Jasmine Ambrose at the time of his sentencing.  *Id.*

Prior to his incarceration, Mr. Cain worked in the construction industry.  *Id.* ¶ 39.  His PSR confirms he worked for numerous construction companies across the United States.  *Id.* ¶¶ 46-53.  He informed the PO that he is a contributing member of society who has always taken care of his children and never shied away from donating or volunteer work.  *Id.* ¶ 39.  He stated that when working construction, he was responsible for eighty to one hundred men at a time and worked twelve-hour days.  *Id.*  He has said that he is not trusting of other people.  *Id.*

At the time of his conviction, Mr. Cain was ostensibly in good physical health, though he was diagnosed with diabetes in 2010.  *Id.* ¶ 41.  He has no reported history of mental health conditions, however in connection with this case he was evaluated

at the Capital Brain Center in Columbia, South Carolina. *Id.* ¶ 42. The evaluating physician issued an Axis I diagnosis of adjustment disorder, anxious, resolved, and found no need for medication. *Id.* Mr. Cain denied to the PO that he had any prior hospitalizations or thoughts of suicide, though the PO determined that in connection with Mr. Cain's offense of conviction, he held a gun to his own head and made suicidal statements to his victim. *Id.* He was subsequently taken into protective custody and released without any medication or follow-up treatment. *Id.*

There is some evidence that Mr. Cain abuses alcohol, though nothing in the PSR suggests that Mr. Cain has a history of drug use. *Id.* ¶ 43. The PSR says that Mr. Cain made extravagant statements about his alcohol abuse to his victim, but the Court has discounted those statements because the amounts of alcohol are physically impossible. *Id.* However, as the Court noted at sentencing, Mr. Cain claims he is only a casual drinker and seldom has more than a few beers. *Sentencing Tr.* at 52:21-53:3. While on bail awaiting his sentence, the Court found Mr. Cain violated his conditions of supervised release by consuming alcohol, which resulted in a charge for operating under the influence and several traffic offenses. *PSR* ¶¶ 4A, 16, 34.

### 2.   Criminal History

At the time of his federal sentencing hearing, Mr. Cain had a criminal history score of one and was scored a criminal history category I. *Id.* ¶ 32. He had two prior convictions. *Id.* ¶¶ 33-34. First, he was convicted of operating under the influence in connection with a March 20, 2013 arrest in Calais, Maine. *Id.* ¶ 30. He incurred a two-day period of incarceration, a $500 fine, and a ninety-day suspension of his

license. *Id.* On June 9, 2013 he was arrested for operating after his license was suspended and for violating conditions of his supervised release following a routine traffic stop. *Id.* ¶ 31. For this offense, he was sentenced to a $250 fine and two days of incarceration concurrently with his sentence for operating under the influence. *Id.*

### 3.   Nature and Circumstances of the Offense

Donald Cain married L.H. in August 2014. *Id.* ¶ 6. The pair met while Mr. Cain, who was living in Calais, Maine at the time, was working on a Walmart store in the Houlton, Maine area where L.H. worked. *Id.* Shortly thereafter, Mr. Cain relocated to San Antonio, Texas for work. *Id.* He wanted L.H. to join him in Texas, but she refused and elected to stay in Maine with her three children. *Id.*

Around November 2014, Mr. Cain began harassing L.H. incessantly. *Id.* Mr. Cain's PSR describes his conduct at length. *Id.* ¶¶ 6-13. The harassment began in November 2014 when Mr. Cain started making anonymous complaints against L.H. to her employer, Daigle Oil Company. *Id.* ¶ 6. Among other accusations, these anonymous complaints asserted that L.H. was sexually harassing her employees, perpetrating racial discrimination, flirting with married customers, and poorly serving her customers. *Id.* Daigle Oil investigated these complaints and found them false. *Id.* Because of the high volume of complaints, Daigle Oil contacted the FBI. *Id.*

An investigation revealed that between November 27, 2014 and December 27, 2015, Mr. Cain stalked and harassed L.H. via telephone calls and text messages. *Id.* ¶ 7. During this time, she lived in Houlton, Maine and he lived out of state. *Id.* At

17

first, Mr. Cain called her twenty-five times per day but, as the harassment progressed, that number rose to an average of over one hundred calls, texts, and emails each day. *Id.* On June 5, 2015 alone Mr. Cain sent L.H. one hundred and twenty-two text messages and one hundred phone calls. *Id.* L.H. reported that she often felt obligated to answer these calls because, if she did not, Mr. Cain would call her mother, sister, and ex-husband. *Id.*

On December 13, 2014, Mr. Cain called L.H. and told her that he planned to shoot her mother in the head. *Id.* ¶ 8. That same day, he sent her a video of him holding a handgun to his own head and threatening to kill himself. *Id.* L.H. called the police and requested a welfare check on Mr. Cain. *Id.* Police located Mr. Cain, who was in the San Antonio, Texas area, performed a welfare check, and took him into protective custody. *Id.* Mr. Cain told officers that he only sent the video to "get a rise out of [L.H.]" *Id.* He hoped that by threatening to kill himself, L.H. would come visit him in Texas. *Id.*

On February 15, 2015, L.H. went to the Houlton Police Department (HPD) because Mr. Cain would not stop harassing her. *Id.* ¶ 9. Mr. Cain called L.H. several times while she was at the HPD. *Id.* An HPD officer answered several of these calls and instructed Mr. Cain to stop harassing L.H. *Id.* He refused and then began using a "spoofing" technology to make it look like his calls to L.H. were coming from the HPD. *Id.* L.H. then obtained a temporary protection order from harassment in state court. *Id.*

Mr. Cain persisted. *Id.* ¶ 10. He made violent threats to L.H., encouraged her to commit suicide, sent her a draft of an obituary he had written for her, promised her that her "kids will not have a mom," and told her that he wished she would "die in a car crash," "get AIDS," or die in a "freak accident." *Id.* Mr. Cain also threatened to rape L.H. and her family members. *Id.* ¶ 11. He sent L.H. video of him having sex with her, which she had been unaware existed. *Id.* He threatened to release those videos to her family if she did not return his calls. *Id.* He regularly accused her of promiscuity and called her many derogatory names. *Id.* ¶ 12. He tracked her location using a cell phone application and messaged her about places she had been. *Id.* This led L.H. to believe that Mr. Cain had associates, such as the Hell's Angels motorcycle gang, surveilling her every move. *Id.*

On January 21, 2016, Mr. Cain was arrested on federal charges arising from this harassment campaign. *Id.* ¶ 13.

### 4.    Guideline Calculations

Mr. Cain scored a total offense level of nineteen and a criminal history category of I. *Statement of Reasons* at 1 (ECF No. 255). His advisory guideline range was thirty to thirty-seven months imprisonment, a one to three-year term of supervised release, and a fine of $10,000 to $100,000. *Id.* The Court found that he lacked the ability to pay a fine. *Id.*

The Court imposed a sentence above the guideline range due to Mr. Cain's extreme conduct and the impact on his victim. *Id.* at 2-3. The Court also considered aggravating factors including that the length, intensity, vulgarity, scope,

sophistication, and victim impact constituted conduct akin to psychological torture. *Id.* at 3. Mr. Cain received a sentence of sixty months imprisonment, followed by a three-year term of supervised release, a $100 special assessment, but no restitution or fine. *Sentencing Tr.* at 73:11-76:7.

## B.   Donald Cain's Medical Records

The Court reviewed an abundance of Mr. Cain's medical records, which both the Government and Mr. Cain submitted. *See Sept. 2020 Medical Records*; *2019 BOP Medical Records filed July 23, 2020*; *2020 BOP Medical Records*; *Def.'s Mot.*, Attach. 4, *Bureau of Prisons Health Servs. Clinical Encounter* (ECF No. 257) (*2018 Medical Records*). Those records show that Mr. Cain suffers from several medical conditions relevant to his motion for compassionate release.

The Court begins by considering Mr. Cain's medical records from 2020. A recent record, dated September 10, 2020, indicates that Mr. Cain suffers from Type 2 Diabetes, has a history of hypertension, a history of hyperlipidemia, and suspected adrenal insufficiency. *Sept. 2020 Medical Records* at 1. The Family Nurse Practitioner noted that by visual inspection, he is obese. *Id.* at 3. He receives chronic care and medications for his Type 2 Diabetes and hypertension. *Id.* at 4. There is some evidence that he has anemia, but records dated September 22, 2020 indicate that his iron levels are currently normal. *Id.* at 23. Records generated on July 10, 2020 corroborate this laboratory finding. *2020 Medical Records* at 23-25.

Records from 2019 paint largely the same picture. *2019 Medical Records* at 7. They show that Mr. Cain had an adrenogenital disorder, hyperlipidemia, and Type 2

Diabetes. *Id.* A BOP medical record from 2018 indicates that Mr. Cain was having syncope episodes, and as a result was not cleared to work in food service. *2018 Medical Records* at 2. In June of 2018 he was transported from Piscataquis County Jail to Mayo Regional Hospital in Dover-Foxcroft, Maine when he complained of chest pains on-and-off for two weeks. *Id.* at 6. At that time, he told the examining physician that he had had a heart attack in New Hampshire in 2014. *Id.* at 7. However, the examining physician ordered a chest x-ray, which showed no pathology consistent with a heart attack. *Id.* at 9. The doctor did not believe that whatever chest pain Mr. Cain was experiencing was related to his heart. *Id.* at 16.

## V.   DISCUSSION

### A.   Exhaustion

Section 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional; it is a mere claim processing rule. *United States v. Whalen*¸ No. 1:11-cr-00033-JAW, 2020 U.S. Dist. LEXIS 118896, at *17-18 (D. Me. July 7, 2020). As such, the Government can waive or concede it. *Id.* at *18. When the Government waives exhaustion, the Court may address the merits of a motion for compassionate release. *Id.* Here, the Government concedes exhaustion so the Court addresses merits of Mr. Cain's motion. *Gov't's Opp'n* at 10-11.

### B.   Danger to the Community

The Court concludes that Mr. Cain has not met his burden to show he is no longer a danger to the safety of the community. 18 U.S.C. § 3142(g) requires the Court to consider whether the defendant has a history of controlled substance

offenses or crimes of violence. In addition, the Court must consider "whether, at the time of the current offense or arrest, [Mr. Cain] was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law . . .." 18 U.S.C. § 3142(g)(3)(B). The Court has commented on the extraordinary intensity, vulgarity and nastiness of Mr. Cain's harassment of L.H. In his motion, even Mr. Cain's prior attorney acknowledged as he had to, that Mr. Cain own conduct was "reprehensible" and "appalling." *Def.'s Mot.* at 6. If Mr. Cain, as opposed to his attorney, had acknowledged that his conduct was wrongful and he was determined to change, it would be one thing. But Mr. Cain has been anything but remorseful. He has consistently blamed others for his own conduct.

On September 30, 2019, Mr. Cain moved to disqualify both this Judge and the Magistrate Judge in this case, alleging that both judges had been biased against him. *Mot. Pursuant to 28 U.S.C. § 455 to Disqualify USDJ John A. Woodcock and USMJ John Nivison in Above Case and Pending § 2255 Transferred from USDC Fort Worth, Texas* (ECF No. 216). On October 15, 2019, Mr. Cain again moved to remove this Judge from the case, falsely claiming that the Judge had deemed him "delusional." *Mot. to Remove Judge Woodcock from Case* at 1 (ECF No. 223). On January 7, 2020, this Judge denied that motion to recuse, correcting innumerable misstatements, misquotations, and misrepresentations that Mr. Cain made in his motions. *Order Denying Mots. to Recuse* at 1031 (ECF No. 237). On January 24, 2020, Mr. Cain filed an appeal of the order denying his motions to recuse, *Notice of Appeal* (ECF No. 239),

and on September 24, 2020, the First Circuit Court of Appeals dismissed his appeal. *J.* at 1 (ECF No. 266); *Mandate* (ECF No. 277).

On October 4, 2019, Mr. Cain filed a habeas corpus petition with this Court, claiming among other things that the FBI Agent in this case initiated it "with corrupt intent." *Pet. for Writ of Habeas Corpus under 28 U.S.C. § 2241* (ECF No. 218) (*Habeas Corpus Pet.*). He asserted that his ex-wife's complaints were "[f]alse." *Id.* He maintained that the FBI Agent and his ex-wife had engaged in a "conspiracy" in order "to cause Plaintiff the injury of unlawful imprisonment." *Id.* He wrote that the victim in this case, his ex-wife, had an "evil mind." *Id.* at 18. He charged that the FBI Agent initiated the investigation as part of a "quid pro quo" to fulfill "his own carnal desires." *Id.* at 18-19. He attached an email to his appellate counsel in which he directly charged that the FBI Agent and his ex-wife were "having an affair." *Id.*, Attach. 1, *Email from Donald Cain to Att'y Solomon* at 1. In the email, he accused a Sergeant with the Houlton Police Department of "falsifying evidence" and that the Sergeant and his ex-wife were also "having an affair." *Id.* He makes allegations against a third law enforcement officer, stating that a Maine State Trooper helped his ex-wife "stage an accident." *Id.* In his petition, he asserted that his defense lawyer, Attorney Tzovarras, coerced him into an "unconscionable plea." *Habeas Corpus Pet.* at 20. He maintained that he was "innocent." *Id.*

In his pro se reply to the Government's response to his petition for habeas corpus, Mr. Cain went further and accused this Judge along with the Magistrate

Judge of being part of the conspiracy against him. *Pet'r's Pro Se Resp. to Gov't's Resp. on 28 U.S.C. § 2255 Pet.* at 2 (ECF No. 243).

He has filed two civil actions on the premise that he is actually innocent of the charge for which he was convicted and sentenced. On March 2, 2020, he filed a lawsuit against his defense lawyer, Hunter Tzovarras, in this Court that claims his lawyer coerced him into pleading guilty and ruined his life. *Cain v. Tzovarras*, No. 1:20-cv-00070-JAW, *Compl.* (ECF No. 1). This civil action is still pending. On March 2, 2020, Mr. Cain filed a lawsuit against the Bangor Daily News and its employees claiming they defamed him because they published comments this Court made to Mr. Cain at his sentencing hearing. *Cain v. Sambides*, No. 1:20-cv-00071-JAW, *Compl.* (ECF No. 1). The Court dismissed this lawsuit. *Id.*, *J.* (ECF No. 17).

In short, Mr. Cain came before this Court on January 18, 2018 and admitted the truth of a five-page prosecution version of his conduct underlying the federal stalking charge, detailing an abusive course of his harassment of his ex-wife. *Prosecution Version* at 1-5 (ECF No. 145); *Tr. of Proceedings*, *Rule 11 Proceedings*, at 16:3-17:3 (ECF No. 209). On July 19, 2018, Mr. Cain admitted that the contents of the Presentence Investigation Report were true, reiterating and elaborating on his extraordinary harassment of his ex-wife. *Sentencing Tr.*, at 6:12-15; *PSR* at 4-7. Since then, Mr. Cain has blamed his ex-wife, the investigators, his defense lawyer, the Magistrate Judge, this Judge, the Bangor Daily News, virtually anyone connected with this case, everyone but himself for his own criminal conduct. Some of his allegations of misconduct have been reckless and scurrilous in the extreme. The

Court is deeply concerned that Mr. Cain has not yet acknowledged the seriousness of his criminal conduct against his ex-wife and the Court views as a significant risk his release into society without any glimmer that he, not others, has been the cause of his own trouble.

### C.    The Section 3553(a) Factors

The Court considered each factor set forth in 18 U.S.C. § 3553(a) when it sentenced Mr. Cain.  *Sentencing Tr.* at 63:7-15.  In particular, the Court focused on Mr. Cain's history and characteristics, the nature and circumstances of his offense, and the need to protect the public, especially his victim, from future crimes.  *Id.* at 63:11-15.  The Court noted that it had "never seen anything like the scope of [Mr. Cain's] harassment."  *Id.* at 69:11-12.  The Court described Mr. Cain's conduct as "utterly reprehensible" because he "psychologically assaulted" his ex-wife.  *Id.* at 71:18-22.  The Court concluded that an offense such as Mr. Cain's "cries out for justice."  *Id.* at 73:8-9.

Mr. Cain's prolonged psychological assault of L.H. cries out for justice as loudly as ever, even though more than two years have passed since his sentencing.  While Mr. Cain is in prison L.H. and her family remain free from his tormenting.  After reviewing the entire record, the Court reaffirms its prior analysis of the § 3553(a) factors.  The need to protect the public and his victim, jointly with the nature and circumstances of his offense, weigh against releasing Mr. Cain.

### D.    Extraordinary and Compelling Reasons

To grant Mr. Cain's petition under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must determine whether "extraordinary and compelling reasons warrant" a reduction in sentence. The Court reviews Mr. Cain's medical conditions and his risk of contracting COVID-19 and finds that although he has several health conditions, he has not shown extraordinary and compelling reasons justify his release.

### 1.     Donald Cain's Medical Conditions

Mr. Cain has several serious health conditions that heighten his risk of severe complications from COVID-19. According to the Centers for Disease Control (CDC), there are several factors that increase a person's risk of severe illness from COVID-19. Arguably, the most decisive factor is a person's age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Nov. 24, 2020). Generally, the risk of COVID-19 increases as a person ages, with over eighty-percent of deaths occurring in people who are sixty-five or older. *Id.* However, people younger than sixty-five may still face high risk of complications. *Id.* People with certain medical conditions are also at high risk. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 24, 2020). These conditions include: cancer, chronic kidney disease, COPD, heart conditions, weakened immune systems from organ transplants, obesity (BMI > 30), severe obesity (BMI > 40), sickle cell disease, pregnancy, smoking, and Type 2 diabetes. *Id.* Moreover, the CDC has indicated that individuals with asthma, cerebrovascular disease, cystic fibrosis, hypertension, non-organ transplant-related

immunodeficiencies, neurologic conditions, liver disease, pulmonary fibrosis, Thalassemia, Type 1 diabetes, or who are overweight, might be at increased risk. *Id.*

The medical records proffered by Mr. Cain and the Government show that he has several of these conditions. Therefore, the Court concludes he is at a heightened risk of complications from COVID-19. Specifically, although Mr. Cain is not over the age of sixty-five, he is obese and has both hypertension and Type 2 diabetes. *Sept. 2020 Medical Records* at 1, 3. As noted, the CDC has concluded individuals with Type 2 diabetes and obesity are at an increased risk of complications and that hypertension might also put a person at increased risk. The Court concludes Mr. Cain's medical conditions weigh in favor of releasing him.

## 2.   FCI Oakdale and COVID-19

The Court now considers how likely it is that Mr. Cain will contract COVID-19 in prison. The relevant data for evaluating Mr. Cain's risk of contracting COVID-19 are the statistics from FCI Oakdale where he is incarcerated. According to the BOP, FCI Oakdale is a low security federal correctional institution in Louisiana, which houses 924 male inmates. *FCI Oakdale I*, BOP, https://www.bop.gov/locations/institutions/oak/ (last visited Nov. 24, 2020). At present there are three confirmed active cases among inmates at FCI Oakdale, and eighteen among staff. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Nov. 24, 2020). Two-hundred and twenty-three inmates and twenty-one staff at FCI Oakdale have caught the virus and recovered. *Id.* However, seven inmates have died. *Id.* This loss of life is tragic;

27

however, by the Court's calculation, the known prevalence of COVID-19 at FCI Oakdale is slight. Presently, 0.3 percent of inmates at FCI Oakdale are known to be positive for COVID-19. *See id.* (3 ÷ 924 = 0.003). As another district court has recently noted, "FCI Oakdale got its early outbreak under control." *United States v. Jones*, Criminal No. 3:14-CR-117-DPJ-FKB, 2020 U.S. Dist. LEXIS 187886, at *9 (S.D. Miss. Oct. 9, 2020).

Given the presently low incidence of COVID-19 among inmates within FCI Oakdale, the Court does not conclude that the risk of contracting COVID-19 substantially weighs in favor of releasing Mr. Cain. That said, the Court recognizes that despite the BOP's admirable efforts to keep inmates safe during a pandemic, prison must be a challenging place for Mr. Cain practice effective social distancing and mitigate his own risk of contracting COVID-19. The Court concludes that this factor weighs in favor of releasing Mr. Cain.

### 3.    Wyoming versus FCI Oakdale

If released, Mr. Cain would not enter a world free from COVID-19. Therefore, the Court must compare the relative risks to Mr. Cain between remaining in FCI Oakdale and being released to home confinement. Mr. Cain proposes to live at his daughter's home in Wyoming. *Def.'s Mot.* at 6. Mr. Cain has provided the Court with virtually no information with which it could meaningfully assess his relative risk of exposure to COVID-19 between FCI Oakdale or Wyoming. Accordingly, Mr. Cain's failure to provide the Court with a satisfactory plan for his own release weighs against releasing him. At the same time, the Court acknowledges the difficulty an

inmate faces, particularly in the middle of a pandemic, in establishing an adequate release plan.

The Court has also considered the risk of contracting COVID-19 in Wyoming. At last count, Wyoming had experienced 25,560 lab-confirmed COVID-19 cases and 3,871 probable cases. *COVID-19 Map and Statistics*, Wyoming Department of Health, https://health.wyo.gov/publichealth/infectious-disease-epidemiology-unit/disease/novel-coronavirus/covid-19-map-and-statistics/ (last visited Nov. 24, 2020). Approximately 17,000 of those infected have recovered; however, 202 have died. *Id.* Given that the number of COVID-19 cases in Wyoming more than doubled in the last month, the Court is concerned that Wyoming might not be a safer environment than FCI Oakdale. *Id.* Nevertheless, the Court is confident that Mr. Cain could more freely practice social distancing and mitigate his risk of exposure. On balance, this factor weighs slightly in favor of releasing Mr. Cain.

### E.   The Balance Weighs Against Granting Donald Cain's Motion

In sum, the balance weighs in favor of denying Mr. Cain's motion for compassionate release. While it is true that Mr. Cain has medical conditions that place him at greater risk of serious complications should he contract COVID-19 in prison, the Court concludes that the seriousness of his offense, the danger he poses to the community and his victim, the need for just punishment, and most particularly, his persistent lack of remorse counsel against his release. He has not met his burden under 18 U.S.C. § 3582(c)(1)(A)(i) to show that compassionate release is proper.

The Court does not wish any harm to come to Mr. Cain as he serves his federal sentence and wishes him well.  The Court is grappling with the problem that, by his repetitive post-sentencing actions, Mr. Cain has not shown that he will not cause harm to others because he has steadfastly refused to acknowledge the harm he caused his ex-wife.  With one exception.  On February 21, 2016, the date he was arrested on the federal charge, Mr. Cain admitted to law enforcement that in communicating with his ex-wife, he had "used vulgar terms" and that he "could be an idiot or jerk with her."  *PSR* at 7.  He went on to admit that he had sent her "ugly" and "shitty" messages over the phone.  *Id.*  This is not the language the Court would use, but it is the language that Mr. Cain himself used.  In his persistent post-sentencing demands for the "truth," this is, in the Court's view, the real truth and Mr. Cain knows it because he spoke it.

## VI.   CONCLUSION

The Court DISMISSES without prejudice Donald Cain's Second Renewed Amended Motion for Compassionate Release (ECF No. 264).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 24th day of November, 2020

30